1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**EASTERN DISTRICT OF CALIFORNIA**

8
9

ARLENE SANDERS and KEN                )        CIV-F 04-5541 AWI TAG
McDANIEL,                             )

10                                            )        ORDER RE: PLAINTIFFS'
                    Plaintiffs,       )        MOTION FOR SUMMARY

11                                            )        ADJUDICATION AND
        v.                            )        DEFENDANTS' MOTION FOR

12                                            )        SUMMARY JUDGMENT
CITY OF BAKERSFIELD,                  )

13    BAKERSFIELD POLICE                )
      DEPARTMENT, ERIC MATLOCK,        )

14    GLEN DAVIS, SCOTT THATCHER        )
      and DOES 1 through 10, inclusive,)

15    sued both in their individual and )
      official capacities             )

16                                            )
                    Defendants.       )

17    _____ )

18
19              This case is before the court on Plaintiffs' motion for summary adjudication and

20    Defendants' motion for summary judgment.  Both motions are opposed.

21
22                                    **I. History**

23              Plaintiffs in this case are Arlene Sanders and Ken McDaniel, who resided at 1905

24    California Street, Apt. #18; Bakersfield, CA in April 1999.  Defendants are the City of

25    Bakersfield ("City"), the Bakersfield Police Department ("BPD"), Eric Matlock (Chief of BPD),

26    Glenn Davis (BPD officer), Scott Thatcher (BPD Officer), and Does 1 through 10, inclusive

27    (additional BPD officers).  On the evening of April 6, 1999, Davis and Thatcher responded to a

28    report of a disturbance at Plaintiffs' apartment complex.  At the scene, the apartment manager

1

1   stated that there was a fight going on inside Plaintiffs' unit.  As Davis and Thatcher approached

2   the unit, they heard loud shouting.  They knocked on the door and identified themselves as BPD

3   officers.  Sanders opened the door, revealing both herself and McDaniel in the living room;

4   Davis and Thatcher entered.  They noticed that Sanders had an abrasion on her cheek and

5   McDaniel put something behind the couch.  Sanders demanded the officers leave and began

6   shouting.  Davis and McDaniel used force to handcuff both Plaintiffs.  Davis conducted a sweep

7   ("First Search") of the whole apartment.  Davis found plastic bags containing what appeared to

8   be cocaine in the right shoe of a pair of work boots in a bedroom closet; the door to the closet

9   was open.  Davis asked McDaniel if he was on parole; McDaniel affirmed he was on parole for a

10  drug violation.  He contacted the BPD to request a team to conduct a full search of the apartment.

11  BPD officers soon arrived and seized the bags of cocaine in the course of a second search of the

12  apartment ("Second Search").  Defendants also claim that Davis and Thatcher were informed by

13  another BPD officer, Orbin Love, on April 5, 1999 (the day before the arrests and searches) that

14  McDaniel was a parolee who was suspected of dealing drugs; Plaintiffs dispute the claim.

15       Plaintiffs were charged with possession for sale of cocaine base in violation of California

16  Health and Safety Code § 11351.5 on May 17, 1999.  On May 26, 1999, Sanders filed a motion

17  to suppress evidence pursuant to Cal. Penal Code § 1538.5, arguing the First Search violated her

18  Fourth Amendment rights.  McDaniel joined the motion on June 1, 1999.  On June 23, 1999, a

19  suppression hearing was held, and Plaintiffs' motion was denied on June 24, 1999.  On June 25,

20  1999, both Plaintiffs entered pleas of guilty.  Sanders pled guilty to a reduced charge of

21  possession of a controlled substance and was sentenced to a term of 16 months in prison.

22  McDaniel pled guilty as charged to possession for sale of cocaine base and was sentenced to a

23  term of five years in prison.  McDaniel was paroled on March 7, 2002.

24       Meanwhile, Plaintiffs appealed the denial of their motion to suppress evidence to the

25  Fifth District Court of Appeal.  In November 2000, the Court of Appeal reversed the lower court

26  decision finding that the First Search was neither a valid protective sweep nor a valid parole

27  search. People v. Sanders, 84 Cal. App. 4th 1211 (Cal. Ct. App. 2000).  The State of California

28  appealed to the California Supreme Court.  On July 31, 2003, in People v. Sanders, 31 Cal. 4th

**2**

1   318 (Cal. 2003), the California Supreme Court held that Bakersfield police officers had violated

2   Plaintiffs' Fourth Amendment rights when searching Plaintiffs' home on April 6, 1999.  In ruling

3   that the motion to suppress must be granted, the California Supreme Court found only that the

4   First Search was not a valid parole search; it expressed no opinion regarding the Court of

5   Appeal's finding that the First Search was not a valid protective sweep. People v. Sanders, 31

6   Cal. 4th 318, 324 n.2 (Cal. 2003).

7          On December 22, 2003, Plaintiffs presented claims for damages under California

8   Government Code §910 to the City of Bakersfield.  Those claims were denied on January 24,

9   2004.  On April 8, 2004, Plaintiffs commenced this suit against Defendants.  Plaintiffs allege that

10  on April 6, 1999, Defendants violated Plaintiffs' "rights to due process of law under both state

11  and federal law by failing to comply with provisions of state law, including, but not limited to

12  California Constitution, Article 1, §§ 1, 7, and 13 and California Penal Code § 1531, and thereby

13  are liable to plaintiff under 42 U.S.C. §1983." Doc. 1, Complaint, at 3:2-6.  Plaintiffs also allege

14  that on the same day, Defendants "violated plaintiffs' Fourth Amendment rights by conducting a

15  warrantless search of plaintiffs' home without consent or exigent circumstances, and further

16  subjected each plaintiff to unreasonable and/or unnecessary force. As a proximate result of these

17  Fourth Amendment violations, each plaintiff was wrongly prosecuted and convicted and

18  sentenced to state prison." Doc. 1, Complaint, at 3:9-13.

19         Plaintiffs sue Defendants Matlock, Davis, Thatcher and Does 1 through 10, in both their

20  individual and official capacities.  In the complaint, Plaintiffs state five causes of action: (1)

21  violation of Plaintiffs' Fourth Amendment rights, entitling Plaintiffs to damages under 42 U.S.C.

22  §1983, against all Defendants; (2) violation of Plaintiffs' Fourteenth Amendment rights, entitling

23  Plaintiffs to damages under 42 U.S.C. §1985(3), against all Defendants; (3) violation of

24  Plaintiffs' California Constitutional rights under Article 1, Sections 1, 7 and 13 against all

25  Defendants, no direct claim of money damages; (4) violation of above enumerated rights,

26

27

28

3

1  entitling Plaintiffs to damages under Cal. Civ. Code § 52.1(b)[1], against the City and BPD; and (5)

2  negligence in managing police, entitling Plaintiffs to damages under Cal. Civ. Code § 1714,

3  against the City and BPD.

4      On May 14, 2004, Defendants filed a motion to dismiss the complaint alleging statute of

5  limitations.  In their motion, Defendants assert that McDaniel's first and second causes of action

6  are barred by the statute of limitations and both Plaintiffs' third, fourth and fifth causes of actions

7  are barred by the statute of limitations.  Defendants contend that McDaniel's first and second

8  causes of action accrued either on April 6, 1999 or March 3, 2002.  Since McDaniel filed suit on

9  April 8, 2004, Defendants argue his causes of action are time-barred by the one-year statute of

10  limitations. Defendants contend the third, fourth and fifth causes of action, which also accrued on

11  April 6, 1999, are time-barred by the statute of limitations because Plaintiffs did not file suit

12  within the requisite six month statute of limitations.  On June 7, 2004, Plaintiffs filed an

13  opposition to the motion to dismiss.  Plaintiffs argue that their causes of actions are not time-

14  barred because their causes of actions did not accrue until the underlying criminal proceedings

15  were resolved in the Plaintiffs' favor on July 31, 2003, when the California Supreme Court

16  affirmed the Court of Appeal's reversal of their convictions.  Plaintiffs also contend that

17  Defendants waived the statute of limitations to the state law causes of actions by not denying

18  them on grounds of timeliness.  On June 9, 2004 Defendants filed a reply and on June 14, 2004,

19  Defendants filed a supplemental reply.  Oral argument on the matter was vacated and the matter

20  was taken under submission.  The motion to dismiss was denied by Order of September 3, 2004.

21  Doc. 16.

22      Plaintiffs filed a motion for summary adjudication on February 10, 2005, seeking judicial

23

24      [1]Cal. Civ. Code § 52.1(b) allows recovery of damages under Cal. Civ. Code § 52.
Plaintiffs request a "civil penalty of $25,000, in accordance with Civil Code 52(b)(1)." Doc. 1,

25  Complaint, at 5:20.  Plaintiffs appear to have misstated their request.  Cal. Civ. Code § 52(b)(1)
does not provide the relief Plaintiff seeks; it provides for exemplary damages for proven

26  violations of Cal. Civ. Code § 51.7 ("right to be free from any violence, or intimidation by threat
of violence, committed against their persons or property because of their race, color, religion...")

27  or Cal. Civ. Code § 51.9 (sexual harassment).  Cal. Civ. Code § 52(b)(2) provides for a civil
penalty of $25,000 for violations of Cal. Civ. Code § 51.7.

28

findings that: "1. The search of plaintiffs' home on April 6, 1999, violated the Fourth

Amendment of the United States Constitution; 2. As a proximate result of the unlawful search,

each plaintiff was sentenced to terms of imprisonment in state prison; 3. Under Cal. Civ. Code §

52.1, each plaintiff is entitled to recover from defendants Glenn Davis, Scott Thatcher, City of

Bakersfield, and Bakersfield Police Department, all damages proximately caused by the unlawful

search." Doc. 20, at 1:26-2:6. Plaintiffs primarily rely on the California Supreme Court decision

in People v. Sanders, 31 Cal. 4th 318 (Cal. 2003), arguing that issue preclusion applies.

Plaintiffs also argue that the First Search was illegal as a matter of law because it was

warrantless, done without consent, and not a valid protective sweep. Defendants filed an

opposition on February 28, 2005, arguing that issue preclusion does not apply due to a lack of

privity between the Defendants and the criminal prosecution in People v. Sanders. Doc. 24.

Defendants also argue that the First Search was a valid protective sweep and/or was a valid

search of a parolee's home (which does not require a warrant). Plaintiffs filed a reply on March

7, 2005. Doc. 27. Oral argument was held on March 14, 2005.

Defendants then filed their own motion for summary judgment on April 18, 2005. Doc.

36, Part 1. Broadly, Defendants argue that (1) no constitutional violation occurred, (2)

Defendants are entitled to qualified immunity, (3) Plaintiffs have failed to provide proof

supporting municipal liability, and (4) Plaintiffs have failed to provide proof supporting liability

against Matlock. On May 13, 2005, Plaintiffs electronically filed declarations and a response to

Defendants' statement of undisputed faces in opposition to the motion. Docs. 40, 41, and 42.

Plaintiffs filed an opposition brief on May 17, 2005. Doc. 44. Oral argument was held on June 7,

2005. At the hearing, the parties were granted additional time to file further briefing. The trial

date of August 23, 2005 was vacated. Defendants filed an additional brief on June 27, 2005.

Doc. 49. Plaintiffs filed their brief on July 12, 2005. A final oral argument was held on August

1, 2005.

The parties did not coordinate and file cross motions for summary judgment. As a result,

the parties have raised a number of discrete issues. Through the course of briefing, additional

issues not originally encompassed in the motions were raised. Each issue will be individually

addressed for summary adjudication.  Each side is interpreted to move for summary adjudication on each issue briefed.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. Proc. 56(c). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968); <u>Ruffin v. County of Los Angeles</u>, 607 F.2d 1276, 1280 (9th Cir. 1979).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank</u>, 391 U.S. at 289; <u>Strong v. France</u>, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Anderson</u>, 477 U.S. 248-49; <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>First Nat'l Bank</u>, 391 U.S. at 290; <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); <u>International Union of Bricklayers v. Martin Jaska, Inc.</u>, 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); <u>Poller</u>, 368 U.S. at 468; <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and

all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(per curiam); <u>Abramson v. University of Hawaii</u>, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts....Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

**B. Summary Adjudication**

The purpose of Rule 56(d) is to salvage some results from the judicial effort involved in evaluating a summary judgment motion and to frame narrow triable issues if the court finds that the order would be helpful with the progress of litigation. <u>National Union Fire Ins. Co. v. L.E. Myers Co., Inc.</u>, 937 F. Supp. 276, 285 (S.D.N.Y. 1996). An order under Rule 56(d) narrows the issues and enables the parties to recognize more full their rights, yet it permits the court to retain full power to completely adjudicate all aspects of the case when the proper time arrives. See 10A C. Wright & A. Miller, Federal Practice and Procedure § 2737, at 455-56 (2nd ed. 1983).

The procedure under Rule 56(d) is designed to be ancillary to a summary judgment motion. Unlike Rule 56(c), which allows for interlocutory judgment on a question of liability, Rule 56(d) does not authorize the entry of a judgment on part of a claim or the granting of partial relief. 10A C. Wright & A. Miller, Federal Practict and Procedure § 2737, at 457 (2nd ed. 1983).

The obligation imposed on the court by Rule 56(d) to specify the uncontroverted material facts is technically compulsory. See <u>Woods v. Mertes</u>, 9 F.R.D. 318, 320 (D. Del. 1949). However, if the court determines that identifying indisputable facts through partial summary judgment would not materially expedite the adjudicative process, it may decline to do so. See 10A C. Wright & A. Miller, Federal Practict and Procedure § 2737, at 460 (2nd ed. 1983).

**C. Prior Statements**

Conclusory self-serving declarations, on their own, are insufficient to create a genuine issue of material fact. Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993). In dealing with inconsistent testimony, the court must make its judgment by "[t]aking the facts to be as [the non-moving party] first admitted them in his deposition testimony and all the inferences which may be drawn therefrom in the light most favorable to [the non-moving party]." Radobenko v. Automated Equipment Corp., 520 F.2d 540, 544 (9th Cir. 1975). Relevant to this case, "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Radobenko v. Automated Equipment Corp., 520 F.2d 540, 544 (9th Cir. 1975), quoting Perma Research & Development Co. v. The Singer Co., 410 F.2d 572, 578 (2nd Cir. 1969).

### III. Statements of Material Facts

**A. Plaintiffs' Statement of Undisputed Material Facts**

1. On April 6, 1999, defendants Glenn Davis and Scott Thatcher were police officers employed by the City of Bakersfield.

2. On April 6, 1999, plaintiffs Arlene Sanders and Ken McDaniel resided at 1905 California Ace., Apt. # 18, Bakersfield.

3. On April 6, 1999, defendants Davis and Thatcher, acting within the course and scope of their employment as Bakersfield Police Officers, entered plaintiff's apartment.

4. The defendant officers did not have consent to enter plaintiffs' apartment.

5. The defendant officers did not have a warrant to enter plaintiffs' apartment.

9

6. After the officers entered plaintiffs' apartment and detained plaintiffs, defendant Davis found, pursuant to a search, plastic baggies each of which contained a chunk of cocaine base. Defendant Davis found the baggies by looking inside a tan work boot which itself was located inside a closet. The closet was inside the master bedroom.

7. Davis conducted his search after both plaintiffs were handcuffed in the living room of their apartment.

8. To get to the bedrooms from the apartment's living room, you must walk down a hallway that connects the living room to the bedrooms, then turn right or left in order to enter a bedroom.

      Disputed. Defendants contend that the bedrooms adjoined the living room rather than being separated by a hallway.

9. When defendant Davis conducted his search, he did not have a warrant.

10. When defendant Davis conducted his search, he did not have consent.

11. When defendant Davis conducted his search, he was unaware that plaintiff Ken McDaniel's parole status was subject to a search condition.

      Disputed. Defendants claim that Davis and Thatcher were aware of McDaniel's parole status at the time of search.

12. Based on evidence recovered in the search, the defendant officers arrested plaintiffs.

13. Based on evidence recovered in the search, plaintiff Arlene Sanders was convicted of violating Cal. Health & Safety Code § 11350, and sentenced to 16 months in prison.

14. Based on evidence recovered in the search, plaintiff Ken McDaniel was convicted of

violating Cal. Health & Safety Code § 11351.5, and sentenced to five years in prison.

**B. Defendants' Statement of Undisputed Material Facts**

1. In or about April 1999, Sgt. Orbin Love received a clue sheet indicating that Kenton McDaniel was selling narcotics from his apartment at 1905 California Street, Apt. # 18, Bakersfield California.

     Disputed.

2. Sgt. Love conducted surveillance of Mr. McDaniel's residence in response to the clue sheet.

     Disputed.

3. On April 5, 1999, Sgt. Love observed some individuals spray painting ("tagging") [sic] private property in a nearby alley while he was conducting surveillance of Mr. McDaniel's residence.

     Disputed.

4. Sgt. Love called for a patrol vehicle to contact the individuals he observed "tagging."

     Disputed

5. Officers Glen Davis and Scott Thatcher responded to Sgt. Love's response call.

     Disputed

6. Sgt. Love informed Officers Davis and Thatcher of his surveillance efforts so that they would be aware of the possible drug activity in their patrol area.

     Disputed.

7. Sgt. Love provided Officers Davis and Thatcher the information that he had developed concerning Mr. McDaniel's possible drug dealing.

     Disputed.

8. Sgt. Love also informed Officers Davis and Thatcher of Mr. McDaniel's parole status and showed them a picture of his person.

     Disputed.

9. On April 5, 1999, Officers Davis and Thatcher knew of Mr. McDaniel's parole status and that he was subject to a search condition.

     Disputed.

10. On April 6, 1999, at approximately 7:35 P.M., Officers Davis and Thatcher responded to a peace disturbance at 1905 California Avenue, Apt. # 18.

11. While in route, Officer Davis was advised by Bakersfield Police Department Communications Center that a possible spousal abuse was in progress.

12. The reporting party for the call was the apartment complex manager, Charolette McKinley.

13. When the officers arrived at the scene, Officer Davis was contacted by the apartment manager regarding the reported criminal activity.

     Disputed. Plaintiffs assert Officer Davis contacted the apartment manager.

14. The apartment manager pointed to apartment #18 and said, "They're fighting up there."

     Disputed. Plaintiffs contend the apartment manager passed on information about potential fighting received from another tenant and did not tell officers that she herself had heard fighting.

15. Officers Davis and Thatcher were neither aware of the number of occupants within apartment #18 nor the actual nature of the violent acts reportedly committed at the plaintiffs' apartment.

     Disputed.  Plaintiffs argue that the apartment manager said the fight was between two people in apartment #18, implying that the officers should have only expected two individuals.

16. Ms. Sanders opened the door and Officer Thatcher advised Officer Davis that he observed an abrasion to Ms. Sanders' right cheek.

     Disputed.

17. Officer Thatcher pushed open the door due to his belief that a possible spousal abuse had occurred at the residence.  Officer Davis also believed that a possible spousal abuse had occurred.

     Disputed.

18. The approximate size of the apartment is 546 square feet.

19. The area where plaintiffs McDaniel and Sanders were situated at the time of the "parole search" and/or "protective sweep" was only a few feet from the other rooms in the apartment.

     Disputed.

20. Within the subject apartment, the master bedroom shares a common wall with the living room.

21. Officers Davis and Thatcher reasonably perceived the apartment as a single continuous room such that the other bedrooms immediately adjoined the place of arrest.

     Disputed.

22. When apprehending plaintiff McDaniel, Officer Davis could see directly into a bedroom containing children items.  This observation alerted him to the fact that a child resided in the apartment but was unaccounted.

     Disputed.

23. Because defendant Davis did not hear or see a child within the apartment and considering the

1  time of the evening (7:30-7:45 p.m.), he inquired from both Mr. McDaniel and Ms. Sanders the

2  whereabouts of the child resident.

3      Disputed.

4

5  24. Neither Mr. McDaniel nor Ms. Sanders offered satisfactory information regarding the

6  whereabouts of the child who obviously resided in the apartment.

7      Disputed.

8

9  25. Officers Davis and Thatcher believed that a child victim was likely present in the apartment.

10     Disputed.

11

12  26. During the "parole search" and/or "protective sweep," Officer Davis entered the southwest

13  master bedroom and observed the closet doors to be opened.

14     Disputed.

15

16  27. Ms. Sanders pled guilty to a charge of possession of a controlled substance, in violation of

17  Health and Safety Code Section 11350, and was sentenced to a term of 16 months in prison.

18

19  28. Mr. McDaniel pled guilty to possession of cocaine base, in violation of Health and Safety

20  Code section 11351.5, and he was sentenced to five (5) years in prison.

21

22  29. Plaintiffs did not challenge the validity of the officer's entry into the apartment but argued

23  that it was unlawful for the police to search the apartment after defendants were handcuffed.

24     Disputed.

25

26  30. The Court of Appeal reversed the judgment against plaintiffs, holding that the "protective

27  sweep" of the apartment was unlawful under the rule announced under *Maryland v. Buie*, (1990)

28  494 U.S. 325, and was not justified as a parole search because the officers were unaware at the

**14**

time of the search that Mr. McDaniel was on parole.

31. The appellate court conceded that it did not have any facts on appeal "...that the bedroom or its closet was an immediately adjoining space for which no probable cause or reasonable suspicion was required under the first part of the *Buie* test." Furthermore, the appellate court stated that "[n]o facts for believing any other individuals that posed a danger might be in the residence can be found in the record..."

32. The California Supreme Court granted review of the appellate decision "to decide whether the search was lawful because Mr. McDaniel was on parole, despite the fact that the officers were unaware of the [his] parole status when they conducted the search."

33. At the time of the search, two children actually resided in the plaintiffs' apartment, Kadejah (5 years old) and Kenton, Jr. (2.5 months old).

34. Plaintiffs have not adduced any evidence which might support a claim against the city and/or defendant Matlock predicated upon a de facto custom, practice, or policy of conducting searches without probable cause.

    Disputed.

35. Plaintiffs have failed to adduce any evidence showing a widespread practice.

    Disputed.

36. Plaintiffs have failed to adduce any evidence showing that retired Chief Matlock had an active or direct involvement in any of the incident giving rise to this lawsuit.

    Disputed.

## IV. Discussion

**A. Statute of Limitations**

Defendants again raise the defense of statute of limitations. Doc. 24, Defs.' Opp'n, at 18:15-20:11.  This issue was resolved in this court's September 3, 2004 Order denying Defendants' motion to dismiss.  This time, Defendants claim that Plaintiffs' claim for monetary damages against the City and BPD under Cal. Civ. Code § 52.1 is time barred since Plaintiffs had to file a claim with the City within six months of the action's accrual in accordance with the requirements of the Government Tort Claims Act (Cal. Gov. Code § 911.2).  Notwithstanding any such requirements, Plaintiffs point out that Defendants have waived any statute of limitations defenses. Doc. 27, Pls.' Reply, at 20:3.  Plaintiffs filed a claim with the City on December 21, 2003.  On January 27, 2004, the City denied the claim and informed Plaintiffs "you have only six (6) months from the date this denial notice was deposited in the mail to file a court action." Doc. 9, Plaintiffs' Opposition to Motion to Dismiss, Ex. B.  "When a claim that is required by Section 911.2 to be presented not later than six months after accrual of the cause of action is presented after such time without the application provided in Section 911.4, the board or other person designated by it may, at any time within 45 days after the claim is presented, give written notice to the person presenting the claim that the claim was not filed timely and that it is being returned without further action....Any defense as to the time limit for presenting a claim described in subdivision (a) is waived by failure to give the notice set forth in subdivision (a) within 45 days after the claim is presented." Cal. Gov. Code § 911.3.  The City pointedly did not give notice as to the Cal. Gov. Code § 911.2 requirement, and waived its statute of limitations defense.

Defendants' motion for summary adjudication on this issue is denied.  The City and BPD have waived their statute of limitations defense.


**B. Issue Preclusion**

Plaintiffs seek to use the California Supreme Court decision in <u>People v. Sanders</u> to preclude Defendants from arguing that the search of Plaintiffs' home was lawful. Doc. 20, Pls.' Brief, at 3:14-16.  On this basis, Plaintiffs seek a judicial determination that the First Search violated Plaintiffs' Fourth Amendment rights.  Under California law, a number of factors must be

met before issue preclusion can apply.  "First, the issue sought to be precluded from relitigation

must be identical to that decided in a former proceeding. Second, this issue must have been

actually litigated in the former proceeding. Third, it must have been necessarily decided in the

former proceeding. Fourth, the decision in the former proceeding must be final and on the merits.

Finally, the party against whom preclusion is sought must be the same as, or in privity with, the

party to the former proceeding. The party asserting collateral estoppel bears the burden of

establishing these requirements." Lucido v. Superior Court, 51 Cal. 3d 335, 341 (Cal. 1990)

(citations omitted).  The only element at issue in this motion is privity. Doc. 24, Defs.' Opp'n, at

9:1-2.

Plaintiffs argue that privity exists between Davis, Thatcher, Matlock, and the BPD

("Police Defendants") and state attorney general's office in People v. Sanders.[2]  The U.S.

Supreme Court conclusively found that the preclusive effect of a state court judgement is

determined by that state's rules of preclusion in 1984. Migra v. Warren City School Dist. Bd. of

Education, 465 U.S. 75, 81 (1984).  A review of California law on the issue of privity does not

show a clear picture.

> Privity is a concept not readily susceptible of uniform definition. Traditionally it has been
> held to refer to an interest in the subject matter of litigation acquired after rendition of the
> judgment through or under one of the parties, as by inheritance, succession or purchase.
> The concept has also been expanded to refer to a mutual or successive relationship to the
> same rights of property, or to such an identification in interest of one person with another
> as to represent the same legal rights and, more recently, to a relationship between the
> party to be estopped and the unsuccessful party in the prior litigation which is
> 'sufficiently close' so as to justify application of the doctrine of collateral estoppel....In
> the context of collateral estoppel, due process requires that the party to be estopped must
> have had an identity or community of interest with, and adequate representation by, the
> losing party in the first action as well as that the circumstances must have been such that
> the party to be estopped should reasonably have expected to be bound by the prior
> adjudication. Thus, in deciding whether to apply collateral estoppel, the court must
> balance the rights of the party to be estopped against the need for applying collateral
> estoppel in the particular case, in order to promote judicial economy by minimizing

[2]Defendants' attorney throughout their papers refer to "defendant officers." See Doc. 24,
Defs.' Opp'n, at 2:11 and 13:1-14.  Plaintiffs, in their papers, also generally refer to the Police
Defendants. See Doc. 20, Pls.' Brief, at 8:16-19; Doc. 27, Pls.' Reply, at 7:8-10.  Plaintiffs have
not made any separate or specific argument in relation to the City.  The court interprets Plaintiff's
motion to seek application of issue preclusion solely against the individual officers, not the City
or BPD.

repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, or to protect against vexatious litigation.

Clemmer v. Hartford Insurance Co., 22 Cal.3d 865, 875 (Cal. 1978) (citations omitted). That is, Clemmer identifies the requirements as (1) an identity or community of interest, (2) adequate representation, and (3) circumstances that should lead a party to expect to be bound. See Vega v. Jones, Day, Reavis & Pogue, 121 Cal. App. 4th 282, 299 (Cal. Ct. App. 2004) (recognizing these three requirements). Older case law suggests some other potential bases: "there are situations where persons neither parties nor privies to parties to an action may be bound by a judgment. The rule is stated in section 84 of the Restatement of Judgments as follows: 'A person who is not a party but who controls an action, individually or in co-operation with others, is bound by the adjudications of litigated matters as if he were a party if he has a proprietary or financial interest in the judgment or in the determination of a question of fact or of a question of law with reference to the same subject matter or transaction; if the other party has notice of his participation, the other party is equally bound.'" Dillard v. McKnight, 34 Cal. 2d 209, 216 (Cal. 1949).

The California Supreme Court once stated "Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case; there is no universally applicable definition of privity." People v. Sims, 32 Cal. 3d 468, 486 (Cal. 1982), quoting Lynch v. Glass, 44 Cal. App. 3d 943, 947 (Cal. Ct. App. 1975). The case law suggests the jurisprudence on privity lacks theoretical coherence. Instead of one single, unified rule of privity, there are multiple bases upon which privity may be found.


**1. Community of Interest**

One possible basis is a shared community of interest between the party against whom privity is sought and the party in the former proceeding. The concept of privity has "been expanded to refer to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights." Dyson v. State Personnel Bd., 213 Cal. App. 3d 711, 723 (Cal. Ct. App. 1989). In Dyson, the

18

1   plaintiff was a counselor at a state-run youth facility.  Peace officers from the youth facility

2   searched plaintiff's home, found stolen items, and turned the items over to the sheriff's

3   department.  Criminal proceedings were initiated against the plaintiff, but the search was

4   determined to be illegal, and the evidence was suppressed.  The youth facility fired the plaintiff,

5   who then sought recourse before a state personnel board.  The seized items were then produced

6   by the youth facility in an administrative hearing on the matter.  The appeals court found that the

7   state personnel board erred in not excluding the evidence, specifically finding that there was

8   sufficient privity between the criminal prosecutors and the youth facility to apply issue

9   preclusion. Dyson v. State Personnel Bd., 213 Cal. App. 3d 711, 727 (Cal. Ct. App. 1989).

10           In coming to this conclusion, the Dyson court relied heavily on People v. Sims, 32 Cal.

11  3d 468 (Cal. 1982), which "held that the administrative decision exonerating a welfare recipient

12  of welfare fraud precluded the district attorney from pursuing a criminal action against the

13  recipient for the same alleged misconduct." Dyson v. State Personnel Bd., 213 Cal. App. 3d 711,

14  725 (Cal. Ct. App. 1989).  In relevant part, "Both entities are county agencies that represented the

15  interests of the State of California at the respective proceedings. The district attorney's office

16  represents the State of California in the name of the 'People' at criminal prosecutions. At fair

17  hearings, the county welfare department acts as the 'agent' of the State. The courts have held that

18  the agents of the same government are in privity with each other, since they represent not their

19  own rights but the right of the government." Dyson v. State Personnel Bd., 213 Cal. App. 3d 711,

20  725 (Cal. Ct. App. 1989), quoting  People v. Sims, 32 Cal. 3d 468, 487 (Cal. 1982).  In another

21  case cited in Dyson, the state motor vehicle agency was precluded from raising the issue of a

22  motorist's arrest for the purpose of justifying suspension of his license after criminal proceedings

23  had determined that the arrest was unlawful.[3] Buttimer v. Alexis, 146 Cal. App. 3d 754 (Cal. Ct.

24

25

26           [3]This holding in Buttimer has been superceded by statute.  Issue preclusion between
    Department of Motor Vehicles administrative proceedings and criminal proceedings was codified
27  by Cal. Veh. Code § 13353.2 in 1990, and is no longer subject to the normal issue preclusion
    analysis, as recognized by the California Supreme Court. Gikas v. Zolin, 6 Cal. 4th 841, 852
28  (Cal. 1993).

1   App. 1983).  The <u>Dyson</u> court recognized the importance of the fact that both the prosecutor's

2   office and the youth facility are agents of the State of California (as was the case in the above

3   cases cited to where privity was found) and went further to require a community of interest.

4   <u>Dyson v. State Personnel Bd.</u>, 213 Cal. App. 3d 711, 726-27 (Cal. Ct. App. 1989).  "From the

5   very start, a convergence between the disciplinary interests and the penal interests was

6   evident....Because a criminal conviction of theft would have constituted cause for the discipline

7   of Dyson under the civil service laws (Gov. Code, § 19572, subd. (k)), the agency's disciplinary

8   interest in the criminal proceeding was direct. The district attorney had every incentive to

9   vigorously litigate the issue of the legality of the search. The agency (through its agents) was the

10  chief 'accuser' at the criminal proceeding. Its role at the disciplinary hearing was the same. The

11  litigation objectives of the district attorney and the Attorney General in their respective

12  proceedings were identical." <u>Dyson v. State Personnel Bd.</u>, 213 Cal. App. 3d 711, 727 (Cal. Ct.

13  App. 1989).

14          In applying <u>Dyson</u> to the facts of this case, the court finds that the Police Defendants do

15  not share a sufficient community of interest with the criminal prosecution.  Plaintiffs claim two

16  interrelated points: first, the interests of the Police Defendants were identical to the interests of

17  the criminal prosecution in the original proceeding ("to prove the legality of the arrest"[4]); and

18  second, the interest of the Police Defendants in this case ("show[ing] probable cause for the

19  warrantless arrest and search, for which he had the burden of proof") is the same as the interest in

20  the criminal proceeding. Doc. 20, Pls.' Brief, at 8:8-11.  Plaintiffs have misinterpreted what is

21  required to constitute a community of interest.  While police do aspire to enforce the law,

22  individual officers can not be said to have a personal stake in ensuring conviction.  Criminal

23  prosecution can be said to have a dual purpose; it punishes an action that has created both public

24  and private injuries.  The state is injured in light of the fact that its laws were violated while

25

26          [4]The court notes that the issue specifically addressed and decided in <u>People v. Sanders</u>

27  was not whether Plaintiffs' arrests were illegal, but rather whether the search of their home was
    illegal.  The court will proceed under the assumption that the community of interest Plaintiffs are

28  in fact referring to is establishing the legality of the search and not the legality of their arrests.

1   private actors are often injured more directly.  Criminal punishments often include both

2   imprisonment and restitution to the victims of the crime, illustrating the dual nature of the

3   proceedings.  In the examples of the welfare department and state personnel board, the state

4   parties against which privity was asserted had a direct stake in the outcome of the suit; the

5   criminal prosecutions alleged that the criminal defendants stole from the state parties.  The

6   Defendants' financial interests were not represented in the criminal prosecution the same way the

7   welfare department or state personnel board were.

8

9   **2. Governmental Bodies**

10       Reliance on a community of interest does not fully explain why privity exists between the

11  criminal prosecution and the motor vehicle agency in Buttimer.  Buttimer v. Alexis, 146 Cal.

12  App. 3d 754 (Cal. Ct. App. 1983).  Another approach to the problem posits that privity is readily

13  found when dealing with governmental bodies.  With state agencies "the fact that the 'State' was

14  involved in both actions might be considered sufficient" to find privity. Dyson v. State Personnel

15  Bd., 213 Cal. App. 3d 711, 727 (Cal. Ct. App. 1989).  The opinions in Dyson, Sims, and

16  Buttimer all dealt with state agencies.

17       Expanding the rule further, at least one court has held that a municipality (a political

18  subdivision distinct from a state agency) is also in privity with the state's criminal prosecution.

19  Miller v. Superior Court, 168 Cal. App. 3d 376, 382-83 (Cal. Ct. App. 1985).  In Miller, a Los

20  Angeles police officer committed a felony while on duty and was convicted of the criminal

21  offense.  The victim then sued the city of Los Angeles and was able to assert issue preclusion to

22  prevent the city from arguing that the police officer did not commit the offense.  The court

23  reasoned that the city and the state both "seek justice on behalf of the People....[the] City has the

24  responsibility of maintaining an efficient and law-abiding police force; thus it is as interested as

25  the People of the State of California in concerning itself with a City police officer who took

26  advantage of and breached a substantial public trust."  Miller v. Superior Court, 168 Cal. App. 3d

27  376, 384 (Cal. Ct. App. 1985).  These cases suggest that all governmental entities are in privity

28  with the state's criminal prosecution as they share the duty of providing rules,  public order, and

21

1   justice.  However, as individual Police Defendants cannot be characterized as governmental

2   bodies, there is no reason to apply privity on this basis.  As previously stated in footnote 2, the

3   court interprets Plaintiffs' motion as seeking to apply issue preclusion solely against the officers

4   as individuals, not against the City or BPD.

5

6   **3. Federal Case Law**

7        Federal precedent supports the conclusion that there is no privity in this case.  Plaintiffs

8   claim that no Ninth Circuit case is directly on point. Doc. 20, Pls.' Brief, at 5:18-19.  Though

9   there is no Ninth Circuit precedent that is binding, that court has not been completely silent on

10  the issue.  In an older Section 1983 suit against police officers, the Ninth Circuit determined that

11  a plaintiff was not allowed to assert issue preclusion on the issues of consent to entry and

12  probable cause to search though these issues had been adjudicated in favor of plaintiff when his

13  criminal conviction was overturned on appeal: "The defendants were city police officers not

14  directly employed by the state; they had no measure of control whatsoever over the criminal

15  proceeding and no direct individual personal interest in its outcome. In these circumstances there

16  was no privity sufficient to invoke the doctrine of collateral estoppel." Davis v. Eide, 439 F.2d

17  1077, 1078 (9th Cir. 1971).  The case pre-dated the U.S. Supreme Court's declaration in Migra

18  that federal courts must look to state law to determine preclusive effect. Migra v. Warren City

19  School Dist. Bd. of Education, 465 U.S. 75, 81 (1984).  With Eide, it is unclear whether the

20  ruling was based on federal or California standards of issue preclusion.  Nevertheless, the

21  reasoning of Eide's holding is in accord with California privity standards.  Having independently

22  reviewed the logic behind Eide, this court concludes that it remains good law.

23       While the issue of privity must be determined with reference to California law, when

24  dealing with issue preclusion, "it is often appropriate to look to the law as it is generally applied

25  in other jurisdictions for additional guidance [unless]...the state-law question is not a particularly

26  difficult one." Haring v. Prosise, 462 U.S. 306, 314 (1983).  California law on privity is anything

27  but clear cut.  In looking at issue preclusion in other states, the majority of federal courts have

28  come to the conclusion that privity does not exist between law enforcement officers and the

1  criminal prosecution. See, e.g., <u>Kinslow v. Ratzlaff</u>, 158 F.3d 1104, 1106 (10th Cir. 1998)

2  (applying Oklahoma law); <u>Tierney v. Davidson</u>, 133 F.3d 189, 195 (2d Cir.1998) (applying

3  Vermont law); <u>Kraushaar v. Flanigan</u>, 45 F.3d 1040, 1050-51 (7th Cir. 1995) (applying Illinois

4  law); <u>Smith v. Holtz</u>, 30 F. Supp. 2d 468, 477 (M.D. Pa. 1998) (applying Pennsylvania law). The

5  Eighth Circuit, in a case applying North Dakota law, has found privity to exist between police

6  officers and the criminal prosecution. <u>Patzner v. Burkett</u>, 779 F.2d 1363, 1369 (8th Cir. 1985)

7  ("the deputies in this case can be properly considered in privity with the state in the prior

8  adjudication and thus bound by the state court's determination that the arrest was illegal"). 

9  However, the Eighth Circuit's decisions dealing with other states' laws have followed the

10 majority view. See <u>Turpin v. County of Rock</u>, 262 F.3d 779, 782-83 (8th Cir. 2001) (applying

11 Nebraska law, "Collateral estoppel cannot be used against the officers in our case, as the officers

12 were neither parties nor in privity with the State in the criminal action and did not have a full and

13 fair opportunity to litigate the issues in the criminal action."); <u>Duncan v. Clements</u>, 744 F.2d 48,

14 51 (8th Cir. 1984) (applying Missouri law, "collateral estoppel is not appropriate in this case

15 because [police officer], the party against whom collateral estoppel is asserted, was neither a

16 party nor in privity with a party to the prior state criminal proceeding").

17      Plaintiffs' motion for summary adjudication on this issue is denied. The California

18 Supreme Court decision in <u>People v. Sanders</u> does not have preclusive effect relative to the

19 Defendants.

20

21 **C. Entry**

22      Plaintiffs have raised the distinct question of whether entry into the apartment on April 6,

23 1999 constitutes a violation of their Fourth Amendment right in their opposition to Defendants'

24 motion for summary judgment. Doc. 44, Pls.' Opp'n, at 3:15-17.  Defendants argue that the entry

25 was "constitutionally permissible under the exigent circumstances exception to the Fourth

26 Amendment." Doc. 49, Defs.' Add'l Brief, at 6:13-14.  The issue of entry was not addressed as

27 part of the motion to suppress in the state courts. See <u>People v. Sanders</u>, 31 Cal. 4th 318, 323

28 (Cal. 2003).

1    Warrentless entry absent exigent circumstances violate the Fourth Amendment. Payton v.

2  New York, 445 U.S. 573, 598-601 (1980).  Exigent circumstances are those "that would cause a

3  reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent

4  physical harm to the officers or other persons, the destruction of relevant evidence, the escape of

5  the suspect, or some other consequence improperly frustrating legitimate law enforcement

6  efforts." United States v. McConney, 728 F.2d 1195, 1199 (9th Cir. 1984).  The standard looks at

7  "the facts known to the officers" at the time of the entry. People v. Ramey, 16 Cal. 3d 263, 276

8  (Cal. 1976).  "[G]ranting unfettered permission to officers to enter homes, based only upon a

9  general assumption domestic calls are *always* dangerous, would violate the Fourth Amendment."

10  United States v. Davis, 290 F.3d 1239, 1244 (10th Cir. 2002) (emphasis in the original).

11  However, specific facts that suggest the threat of violence can constitute circumstances allowing

12  entry.

13    In a similar case concerning the suspicion of domestic violence, the Ninth Circuit found

14  exigent circumstances.  "Police received an emergency call for aid. [Officer] talked to the hotel

15  guest who feared an assault was occurring in [individual's] room, and [officer] confirmed by

16  [individual's] statement that a woman was in the room. When [individual] opened the door, he

17  admitted that the woman had been 'loud.' [Officer] saw the hotel room in disarray. No woman

18  was in sight. [Officer's] entering the room was justified by an objectively reasonable belief that a

19  woman might be injured and entry was 'necessary to prevent physical harm' to her." United

20  States v. Brooks, 367 F.3d 1128, 1135 (9th Cir. 2004).  In the opinion, the Ninth Circuit

21  suggested that police have wide latitude in domestic dispute cases.  The court noted that due to

22  "the tendency of victims of domestic abuse to be less than forthcoming  about the harms to which

23  they were or will likely be exposed at the hands of an aggressor who remains on the scene" the

24  officer was permitted to investigate further. United States v. Brooks, 367 F.3d 1128, 1136 (9th

25  Cir. 2004).  The court specifically stated that the officer need not have taken the least intrusive

26  route of interviewing the individuals outside of the hotel room and thereby avoiding the violation

27  of the occupants' interest against search of their room. United States v. Brooks, 367 F.3d 1128,

28  1135-36 (9th Cir. 2004).

1    In another case, officers responding to a domestic disturbance call were met at the door

2  by a woman with "a 'little red mark' under one eye and slight darkness under both eyes." People

3  v. Higgins, 26 Cal. App. 4th 247, 249 (Cal. Ct. App. 1994).  The police, in circling the house,

4  had already determined that there was a man inside.  Despite the woman's explanation that the

5  mark was a birth mark and a denial that anyone else was inside, police entered.  In affirming the

6  trial court's finding of exigent circumstances, the opinion noted that the trial court said "the

7  officers would have been derelict in their duty had they taken [the woman's] word she was

8  okay." People v. Higgins, 26 Cal. App. 4th 247, 250 (Cal. Ct. App. 1994).

9    In this case, Davis and Thatcher were responding to a domestic disturbance call.  In a

10  deposition taken on February 24, 2005, Sanders admits that she and McDaniel had an argument

11  on April 6, 1999 though she did not know if neighbors could hear it. Doc. 41, Ex. A, Transcript,

12  at 21:14-20.  At the suppression hearing in 1999, Charlotte McKinley, the apartment manager of

13  the complex in which Plaintiffs resided, testified that she received a report from apartment 17

14  that the woman in apartment 18 was being "beat up by her boyfriend." Doc. 41, Ex. F, Transcript,

15  at 47:11-17.  Though she did not hear "any loud yelling voices" herself, she told Davis and

16  Thatcher that "there was a fight going on between Arlene Sanders and her boyfriend in No. 18."

17  Doc. 41, Ex. F, Transcript, at 45:7-9 and 45:28-46:1.  Davis and Thatcher claim to have heard an

18  ongoing argument as they approached the apartment. Doc. 36, Part 5, Davis Decl., at 2:10-12 and

19  Doc. 36, Part 13, Thatcher Decl., at 2:10-12.  Thatcher claims that as Sanders opened the door,

20  he observed an "abrasion on her right cheek." Doc. 36, Part 13, Thatcher Decl., at 2:22.  At that

21  point Davis and Thatcher entered without the consent of Plaintiffs.  Defendants dispute this

22  version of events.  In deposition, Sanders said only that she "did not recall having an abrasion";

23  she did not deny the appearance of an abrasion. Doc. 41, Ex. A, Sanders Dep., at 23:6-7.  She

24  also states that she told Davis and Thatcher at the door that she "didn't need his assistance." Doc.

25  41, Ex. A, Transcript, at 23:12-13.  On the whole, this testimony does not contradict Defendants'

26  version of events.  In Brooks, the suspected victim was not visible to the officer and the room

27  was disordered.  In this case, Thatcher saw what he believed to be an injured woman.  While he

28  could have interviewed Sanders at the door concerning the argument and/or any injuries, entry

25

1   into the apartment was reasonable given the circumstances.  Police Defendants had articulable

2   facts which supported their view that entry was necessary to prevent harm to Sanders.

3   Defendants' motion for summary adjudication on this issue is granted.  The initial entry

4   was legal.

5

6   **D. First Search**

7   Both parties have moved for adjudication on the legality of the First Search on a variety

8   of theories.  Plaintiffs argue that their motion for summary adjudication should be granted even if

9   the court does not apply issue preclusion.  Defendants admit that the First Search was done

10  without consent or warrant.  However, Defendants argue that summary adjudication must be

11  granted in their favor as the First Search is justified as either a parole search, a protective sweep,

12  or search due to exigent circumstances. Doc. 20, Pls.' Brief, at 9:5.

13

14  **1. Parole Search**

15  Plaintiffs argue that the First Search was not a parole search.  Defendants state that the

16  First Search was justified as a parole search since Davis and Thatcher were aware of McDaniel's

17  parole status.  In recent declarations, Thatcher and Davis state that they knew of McDaniel's

18  parole status as of April 5, 1999. Doc. 24, Part 1, at 2:5-6 and Doc. 24, Part 6, at 2:5-6.  In

19  addition, Defendants have provided the corroborating declaration of Officer Love. Doc. 24, Part

20  5.

21  Plaintiffs have provided Davis's police report concerning the arrest of Plaintiffs, which he

22  prepared the day of the arrest itself. Doc. 20, Ex. B.  In it, Davis stated that he asked McDaniel

23  his parole status before conducting the First Search. Doc. 20, Ex. B, at 5.  At the suppression

24  hearing, much of the questioning focused on whether Davis knew McDaniel was on parole

25  before or after the First Search.  The evidence shows that Davis did not find out about the status

26  until after the First Search and that any confusion surrounding the issue arose from the fact that

27  he used the term "search" to refer solely to the Second Search as the First Search was only a

28  "protective sweep." Doc. 29, Ex. B, Transcript, at 21:1-2 and 24:22-25:1.  Davis answered yes to

1   the question "After your protective sweep, did you ask Mr. McDaniel about any status on being

2   on parole or probation?" Doc. 29, Ex. B, Transcript, at 18:15-18.  His further testimony supports

3   the conclusion that Davis did not know that McDaniel was on parole subject to a search

4   condition while conducting the First Search.  When asked if he learned that McDaniel was on

5   parole from another source, Davis replied:

6        Q. Did you check to see if he was on parole in some other way than talking to him?

7        A. Yes.

8        Q. How?

9        A. I called the police department communication, and NCI said he was on active parole.

10  Doc. 29, Ex. B, Transcript, at 19:28-20:5.  Though he claims otherwise now, Davis gave no

11  indication at the time that he knew of McDaniel's parole status before asking McDaniel.

12       Nevertheless, the deposition of Officer Love must be considered.  He is an arguably

13  disinterested third party.  He states that he conducted surveillance of McDaniel's apartment due

14  to a tip that McDaniel was dealing narcotics from that site.  When Police Defendants responded

15  to an unrelated incident of spray painting in the area, Love states he "informed Officers Davis

16  and Thatcher of Mr. McDaniel's parole status and showed them a picture of him." Doc. 24, Part

17  5, Love Decl., at 2:4-5.  However, he is imprecise as to the date he spoke with Davis and

18  Thatcher, only stating that his surveillance of McDaniel took place "[i]n or about April 1999."

19  Doc. 24, Part 5, Love Decl. At 1:22-23.  Davis and Thatcher claim the meeting took place April

20  5, 1999, the day before the incidents that give rise to this case. Doc. 24, Part 1, Thatcher Decl., at

21  1:26-2:6 and Part 6, Davis Decl., at 1:26-2:7.  Based on these facts, Defendants have provided

22  enough evidence to avoid summary adjudication against them on this issue.

23       Neither side has provided sufficient evidence to justify adjudication of this issue.

24  Whether the First Sweep can be justified as a parole search is a question reserved for trial.

25

26  **2. Protective Sweep**

27       Defendants claim that the First Search constituted a protective sweep.  Plaintiffs dispute

28  this characterization and claim the First Search violated their Fourth Amendment rights.  "There

is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' -- construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs -- or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant." Chimel v. California, 395 U.S. 752, 762-63 (1969) (citations omitted).  However, the U.S. Supreme Court has more recently expanded the scope of permissible police action, holding that when arresting an individual in his/her home, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" and further "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 334, 327 (1990). These two cases demonstrate that protective sweeps are designed to prevent harm to police from two distinct sources: the arrestee using a weapon close at hand (Chimel) and an antagonistic third party located nearby (Buie).  Defendants seek to justify the First Search as a protective sweep under Buie.

**a. Arrest**

The Ninth Circuit has made clear a protective sweep can only be undertaken incident to an arrest. United States v. Reid, 226 F.3d 1020, 1027 (9th Cir. 2000) (pointing out that detainee was not under arrest at time of search as one of two reasons why the search was not a valid protective sweep).  Absent an arrest, the mere seizure of an individual can not justify a protective sweep.  This bright line rule is in conflict with subsequent decisions in other federal circuits. See United States v. Gould, 364 F.3d 578, 584 (5th Cir. 2004) ("arrest is not always, or *per se*, an indispensable element of an in-home protective sweep"); United States v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001) ("the principle enunciated in Buie with regard to officers making an arrest--that the police may conduct a limited protective sweep to ensure the safety of those

1   officers--applies with equal force to an officer left behind to secure the premises while a warrant

2   to search those premises is obtained").  Nevertheless, the Ninth Circuit decision is applicable in

3   this case.

4        A person has been "seized" under the Fourth Amendment if their freedom of movement

5   has been restrained by a show of authority such that a reasonable person in the circumstances

6   would believe that they are not free to walk away.  United States v. Chan-Jimenez, 125 F.3d

7   1324, 1326 (9th Cir. 1997).  A seizure amounts to an arrest when a reasonable person

8   understands the restraint on their freedom of movement to the degree which the law associates

9   with formal arrest.  United States v. Corral-Franco, 848 F.2d 536, 540 (5th Cir. 1988).  At the

10  time the First Search was conducted, it does not appear that either of the Plaintiffs were under

11  arrest.  Police Defendants entered the apartment and subdued Plaintiffs in response to their

12  aggressive behavior.  Both Plaintiffs were handcuffed at this point.  Davis then undertook the

13  First Search whereupon he found what he suspected to be illegal narcotics.  He then questioned

14  McDaniel regarding his parole status.  Davis testified that he Mirandized McDaniel after the

15  questioning. See Doc. 41, Ex. F, Transcript, at 18:15-18 and 19:5-13.  He also testified that he

16  did not Mirandize him earlier as he "wasn't interrogating him for any crime [before] that time."

17  Doc. 41, Ex. F, Transcript, at 19:18-19.  Sanders was Mirandized at about the same time

18  McDaniel was Mirandized. Doc. 24, Part 6, Davis Decl., at 5:8-10.  Based on these facts,

19  Defendants have not definitively proved that there was an arrest prior to the First Search.

20       Neither party has addressed this issue.  Whether the Plaintiffs were arrested prior to the

21  First Search is a question reserved for trial.

22

23  **b. Adjoining Spaces**

24       A protective sweep is limited to the "closets and other spaces immediately adjoining the

25  place of arrest from which an attack could be immediately launched" and is "not a full search of

26  the premises, but may extend only to a cursory inspection of those spaces where a person may be

27  found." Maryland v. Buie, 494 U.S. 325, 334-35 (1990).  In order to conduct a search that

28  extends beyond adjoining spaces, police must show "articulable facts which, taken together with

the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 334 (1990).  The lack of information about surroundings does not constitute an articulable fact. United States v. Colbert, 76 F.3d 773, 778 (6th Cir. 1996) ("'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place").  Defendants have provided no articulable facts to suggest the presence of an individual posing a danger; the analysis is limited to what constitutes an adjoining space.

Courts from outside the Ninth Circuit have found that a protective sweep of adjoining spaces can encompass rooms other than the one in which an individual is arrested as long as they are close by.  In one case, an individual was chased upstairs and arrested in the corner of a bedroom.  The D.C. Circuit found that a search of a different bedroom which was "only a few feet from the larger bedroom door and only a few feet from the top of the stairs" was valid as it could be considered an adjoining space. In re Sealed Case 96-3167, 153 F.3d 759, 770 (D.C. Cir. 1998).  The D.C. Circuit also permitted the search of a bedroom off a hallway in which an individual was arrested as it could be considered an adjoining space. United States v. Ford, 56 F.3d 265, 270 (D.C. Cir. 1995).  In another case, the Second Circuit found that the search of both rooms of a two room apartment was valid as a protective sweep of adjoining spaces even though the individual arrested was only in one room. United States v. Lauter, 57 F.3d 212, 216 (2nd Cir. 1995).  The Northern District of Illinois dealt with a case where an individual was arrested in the doorway where a hallway joined the main room.  The district court determined that a locked bedroom found off that hallway was considered an adjoining space. United States v. Robinson, 775 F. Supp. 231 (N.D. Ill. 1991).

Ninth Circuit precedent supports this conclusion, albeit a bit more obliquely.  In a habeas case, the Ninth Circuit found that search of a small attic space accessible from the room in which the petitioner was arrested was valid as the space was adjoining. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).  In another case that is factually similar to this one, the Ninth Circuit found the search was not a valid protective sweep on other grounds. United States v. Noushfar, 140 F.3d 1244, 1245 (9th Cir. 1996) .  The individuals were arrested for conspiracy to

smuggle banned goods and detained in the living room of their apartment.  Police then searched the whole apartment for half an hour.  During the search, the police found a box of business receipts in a closet; they examined the contents of the box.  In objecting to the search, the Ninth Circuit found that it "exceeded the limits of a *Buie* sweep in both time and scope....Even if the box had been in 'plain view,' the further examination exceeded the narrow purpose of a *Buie* sweep." United States v. Noushfar, 140 F.3d 1244, 1245 (9th Cir. 1996).  The court did not find the fact that the whole apartment was searched to be objectionable.  On the whole, the judicial consensus is that adjoining spaces should be broadly interpreted, especially in homes of small size. But see Watts v. County of Sacramento, 65 F. Supp. 2d 1111, 1118 (E.D. Cal. 1999), rev'd on other grounds, 256 F.3d 886 (9th Cir. 2001) (In a house of indeterminate size and configuration, the district court found the bedrooms were not adjoining spaces where the individual was arrested in the kitchen.).

   In the motion to suppress, the California Supreme Court did not address the issue, pointedly "express[ing] no view regarding the Court of Appeal's ruling that the 'protective sweep' of the apartment violated the rule announced in Maryland v. Buie." People v. Sanders, 31 Cal. 4th 318, 324 n.2 (Cal. 2003).  Here, Thatcher states that the apartment was approximately 546 square feet (21 feet by 26 feet). Doc. 25, Ex. C.  Defendants claim that due to its size, the apartment constituted a "single continuous room such that the other bedrooms immediately adjoined the place of arrest." Doc. 24, Defs.' Opp'n, at 16:19-21.  Plaintiffs were detained in the main living area and the doors to the two bedrooms were open.  The bedroom in which the drugs were found shares a wall with the main living area.  In an apartment of this size, the bedrooms are necessarily only a few feet away from the living area.  The bedrooms must be considered adjoining spaces which the officers could sweep as a precautionary matter without any particularized suspicion.

   Defendants' motion for summary adjudication on this issue is granted.  The bedroom closet is an adjoining space.


**c. Plain View**

1       A protective sweep is "narrowly confined to a cursory visual inspection of those places in

2 which a person might be hiding"; any evidence seized must be in "plain view." <u>Maryland v. Buie</u>,

3 494 U.S. 325, 327 (1990).  While Plaintiffs object to the description of the First Search as a

4 protective sweep on the basis that bedrooms are not adjoining spaces, Plaintiffs do not directly

5 argue that the drugs were not in plain view within the bedrooms. See Doc. 20, Pls.' Brief, at 9:5-

6 10:2; Doc. 27, Pls.' Reply, at 14:7-17:4.  The evidence was found within a shoe that was in the

7 closet of one of the bedrooms; the closet door was open and Davis claims that the plastic bags in

8 which the drugs were contained were in plain view when he looked at the closet. Doc. 24, Part 6,

9 at 4:9-14.

10       Neither party has fully briefed the issue.  Whether the evidence was in plain view is a

11 question reserved for trial.

12

**3. Exigent Circumstance of Missing Child**

14       Defendants seek to justify the First Search as one in which they sought to ascertain the

15 location of a missing child.  The affidavits of Davis and Thatcher reflect their belief that there

16 was a child who also lived in the apartment due to the presence of children's items. Doc. 24,

17 Parts. 1 and 6.  When asked about the possible presence of a child, the Defendants claim that

18 neither of the Plaintiffs responded.  Police can conduct a search when circumstances are such

19 "that would cause a reasonable person to believe that entry (or other relevant prompt action) was

20 necessary to prevent physical harm to the officers or other persons, the destruction of relevant

21 evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate

22 law enforcement efforts." <u>United States v. McConney</u>, 728 F.2d 1195, 1199 (9th Cir. 1984).

23 Davis claims in his declaration that he believed "a child victim was likely present in the

24 apartment," justifying their search. Doc. 24, Part 6, at 4:7-8.  As the Police Defendants were

25 responding to a suspected domestic violence incident, searching for a child may have been

26 warranted.

27       The Police Defendants claim to have asked Plaintiffs about the possible presence of a

28 child, to which Plaintiffs refused to respond.  As part of his police report, Davis stated that after

additional BPD officers had arrived and as the second search was taking place, they made further inquiries on the matter.  Thatcher obtained a copy of the rental application.  "According to the rental application and due to the children's furnishings in the apartment, there were indications that a small child lives with McDaniel and Sanders; however, neither of them would provide us with information on the child or where the child was during our investigation." Doc. 20, Ex. B, at 6.  However, the exigent circumstances must be evaluated with reference to what the Police Defendants knew at the time they undertook the First Search.  That is, Davis noted the presence of infant articles but had no knowledge of the contents of the rental agreement.  Plaintiffs argue that the rationale is a sham, presenting Davis's testimony at the suppression hearing in 1999:

> Q. Did you have the opportunity a short time later to inspect any of the other rooms in the house?
>
> A. Yes.
>
> Q. Why?
>
> A. Protective sweep.
>
> Q. What do you mean?
>
> A. For our safety we make a protective sweep of the residence to make sure there is no one else in the residence that could endanger our safety.

Doc. 29, Ex. B, Transcript, at 16:23-17:3.  Unfortunately, the full text of the deposition is not part of the record.  However, Davis did state that one of the bedrooms contained a baby crib and other infant articles. Doc. 29, Ex. B, Transcript, at 23:11-12.  Davis did not state or imply that the protective sweep was motivated, even in part, by the need to determine whether a young child was present.[5]  In dealing with inconsistent testimony, the court must make its judgment by "[t]aking the facts to be as [the non-moving party] first admitted them in his deposition testimony and all the inferences which may be drawn therefrom in the light most favorable to [the non-moving party]." Radobenko v. Automated Equipment Corp., 520 F.2d 540, 544 (9th Cir. 1975). The prior testimony is clear.  Davis makes no mention of looking for a child, justifying the First

---

[5]As a matter of language, a "protective sweep" refers only to searches to ferret out individuals who pose a threat.  A search to find a young child (who would clearly not be a threat) would more properly be classified under the broader category of an exigent circumstance.

1   Search as a sweep to look for individuals who could pose a danger to Police Defendants.

2       Plaintiffs' motion for summary adjudication on this point is granted.  The First Search

3   was not undertaken by Davis to look for a potential missing child.

4

5   **4. Conclusion on First Search**

6       The legality of the First Search overall is still at issue in this case.  Parties may present

7   evidence and argue that the First Search was/ was not a parole search.  Parties may present

8   evidence that the First Search was/ was not a protective sweep, with the exception of the issue of

9   adjoining spaces.  Defendants may not argue or present evidence that Davis was looking for a

10  missing child.

11

12  **E. Monell Liability**

13      A municipality may be liable "when execution of a government's policy or custom,

14  whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

15  official policy, inflicts the injury." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

16  Monell liability will only attach if the plaintiff suffered an underlying constitutional violation.

17  See County of Sacramento v. Lewis, 523 U.S. 833, 837-8 (1998) (no liability where there was no

18  underlying constitutional right violated); Cooper v. Dupnik, 924 F.2d 1520, 1528 (9th Cir. 1991)

19  ("If the conduct of the individual officers is not a constitutional violation, then the fact that the

20  two law enforcement departments condoned such conduct cannot turn it into one").

21      Defendants argue that Plaintiffs have provided inadequate proof. Doc. 32, Defs.' Memo,

22  at 15:15-16.  Plaintiffs argue in opposition that "Davis and Thatcher testified that in entering

23  plaintiffs' home, detaining them, and searching the apartment, they acted in accordance with their

24  training and department policy. Further they had never been reprimanded or retained [sic]

25  notwithstanding the decision in People v. Sanders. Nor has Matlock taken any action to insure

26  that violations of the type complained of here do not occur." Doc. 44, Pls.' Opp'n, at 5:22-27.

27  Plaintiffs appear to be arguing that the BPD had a policy of training which taught officers to

28  violate Fourth Amendment rights.  However, Plaintiffs have not provided specific citations for

the Davis and Thatcher testimony.  The court is not required to search through the record

independently to ascertain a party's assertions. See S. Cal. Gas Co. v. City of Santa Ana, 336

F.3d 885, 889 (9th Cir. 2003) ("General references without page or line numbers are not

sufficiently specific."); Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

Nevertheless, the court has partially reviewed the incomplete transcripts and depositions lodged

in this case.  In relevant part the court found the deposition of Davis included this exchange:

> Q. To the best of your knowledge, you were following your department training in entering the apartment; is that true?
>
> A. Yes, sir.
>
> Q. And in conducting the protective sweep search, you were following department policy in practice as far as you knew, right?
>
> A. I don't think we have a policy specifically about protective sweeps, but I don't – I'm not aware that I was violating one.

Doc. 41, Ex. D, Davis Dep., at 54:11-20.  As the Police Defendants' entry into the apartment did

not violate the Fourth Amendment, there can be no Monell liability for that act.  Even if the

training policy was unconstitutional on its face, Plaintiffs' have no legal case based on entry.

With reference to the protective sweep, Davis states that there was no training policy regarding

protective sweeps.  Based on the slim evidence provided, Plaintiffs' case must rest on the

argument that inadequate training regarding protective sweeps constitutes a policy which caused

their Fourth Amendment rights to be violated.

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability

under Monell, unless proof of the incident includes proof that it was caused by an existing,

unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.

Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved.

But where the policy relied upon is not itself unconstitutional, considerably more proof than the

single incident will be necessary in every case to establish both the requisite fault on the part of

the municipality, and the causal connection between the 'policy' and the constitutional

deprivation." <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985) (plurality opinion).[6]  With

regards to a "thoroughly nebulous 'policy' of 'inadequate training,'" the U.S. Supreme Court

required "proof that the policymakers deliberately chose a training program which would prove

inadequate." <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985) (plurality opinion).  Without

additional detail, no causation between the supposed lack of training and the constitutional

violation can be established.

The Ninth Circuit has followed the rule laid out in <u>Tuttle</u> and stated "A plaintiff cannot

prove the existence of a municipal policy or custom based solely on the occurrence of a single

incident of unconstitutional action by a non-policymaking employee." <u>Davis v. Ellensburg</u>, 869

F.2d 1230, 1233 (9th Cir. 1989).  In another case, the Ninth Circuit ruled that summary

judgement on <u>Monell</u> claims should have been granted to defendants as plaintiffs failed to

"establish that the use of excessive force was a formal policy or wide-spread practice of the

[police] or that previous constitutional violations had occurred for which the offending officers

were not discharged or reprimanded." <u>Nadell v. Las Vegas Metro. Police Dep't</u>, 268 F.3d 924,

930 (9th Cir. 2001).

Plaintiffs rely on <u>LaLonde v. County of Riverside</u>, 204 F.3d 947, 961 (9th Cir. 2000) for

the proposition that testimony by a defendant that "his actions were 'in accordance with policy'

was sufficient for imposing <u>Monell</u> liability." Doc. 44, Pls.' Opp'n, at 6:3-6.  The case is

distinguishable.  In <u>LaLonde</u>, the defendant had affirmatively "testified about the official policy

of the Sheriff's Department concerning its techniques for handcuffing," firmly establishing the

existence of the policy and providing explicit detail. <u>LaLonde v. County of Riverside</u>, 204 F.3d

---

[6]<u>Tuttle</u> was a case in which Justice Powell did not take part; the U. S. Supreme Court
heard the case with eight justices.  The relevant section cited above was written by Justice
Rehnquist, and joined by Justices Burger, White, and O'Connor.  Subsequently, the U.S.
Supreme Court (with all nine justices participating) took up the issue of the "single incident" rule
again in <u>Springfield v. Kibbe</u>, 480 U.S. 257, 267 (1987).  The majority dismissed the appeal as
one in which writ of certiorari was improvidently granted due to procedural problems in the case.
Nevertheless, in dissent, Justice O'Connor (joined by Justices Rehnquist, White, and Powell)
discussed the merits of the case and affirmatively relied on the rule in <u>Tuttle</u>. <u>Springfield v.
Kibbe</u>, 480 U.S. 257, 270 (1987) (dissenting opinion).

947, 961 (9th Cir. 2000).  The trial court sustained an objection to testimony as to whether the defendant's actions were in accordance with that policy.  The Ninth Circuit found that the testimony was suppressed in error.  In this case, Plaintiffs have not provided testimony that the actions were in accordance with a set policy regarding protective sweeps.  At most, there is evidence that Davis did not believe he was violating his past training.  Plaintiffs must provide some evidence their rights were violated by a lack of training that was so deficient prior to April 6, 1999 that the City "knows or reasonably should know [it] would cause others to inflict the constitutional injury."  Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978).

Defendants' motion for summary adjudication on this issue is granted.  Plaintiffs' Monell liability claims are dismissed.  The City and the BPD are dismissed from the case.

**F. Liability of Matlock**.

Defendants argue that Plaintiffs have provided inadequate proof to support a finding of liability against Police Chief Matlock.  Doc. 36, Part 3, at 17:10-11.  Plaintiffs argue that Matlock is liable because he has not "taken any action to insure that violations of the type complained of here do not occur."  Doc. 44, Pls.' Opp'n, at 5:25-27.  Plaintiffs' case appears to rest solely on Matlock's actions subsequent to April 6, 1999, not on his actions prior to that date.

"Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability.  A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. 'Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."  Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir. 1989), quoting Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987).  "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

1    Plaintiffs cite to Watkins v. City of Oakland, 145 F.3d 1087 (9th Cir. 1998) for the

2  proposition that a police chief is liable when he/she ratifies subordinates' unconstitutional

3  conduct. Doc. 44, Pls.' Opp'n, at 6:2.  However, Watkins involved a police chief who "signed an

4  internal affairs report dismissing [plaintiff's] complaint despite evidence of [the officer's] use of

5  excessive force contained in the report and evidence of [the same officer's] involvement in other

6  police dog bite incidents, and apparently without ascertaining whether the circumstances of those

7  cases required some ameliorative action." Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th

8  Cir. 1998).  Watkins involved several incidents, showing that the police chief's actions in

9  ignoring previous excessive force complaints against one officer (effectively ratifying the

10 behavior) caused the plaintiff's Fourth Amendment rights to be violated.  In this case, Plaintiffs

11 have not provided any evidence of incidents aside from the April 6, 1999 incident.  Plaintiffs

12 instead rely on the fact that there was no formalized process for retraining Police Defendants

13 after the California Supreme Court made its determination.[7]

14    Ninth Circuit precedent appears to be split on what legal effect a supervisor's actions

15 subsequent to the incident giving rise to the Section 1983 claim has on the supervisor's liability.

16 In many cases, subsequent action (or lack of action) does not matter. See Hansen v. Black, 885

17 F.2d 642, 646 (9th Cir. 1989) ("Nothing the police chief did subsequent to the incident could

18 [support] liability for the incident.");  Hutchinson v. Grant, 796 F.2d 288, 291 (9th Cir. 1986)

19 ("Nothing the police did subsequent to the incident with [plaintiff] could affect [the

20 municipality's] liability for the incident.").  However, the Ninth Circuit has also said, "Policy or

21 custom may be inferred if, after the shakedown, the prison officials took no steps to reprimand or

22 discharge the guards, or if they otherwise failed to admit the guards' conduct was in error."

23 McRorie v. Shimoda, 795 F.2d 780 (9th Cir. 1986).  McRorie is distinguishable as it dealt with

24 an appeal from the grant of a motion to dismiss (avoiding the question of evidence) and dealt

25 with multiple instances of misconduct.

26 ────────

27    [7]Plaintiffs' argument is logically flawed as the California Supreme Court dealt solely with
the issue of parole search and not protective sweep.  Plaintiffs do not appear to allege that the
28 BPD's training or Matlock's orders regarding parole search are insufficient.

38

1    Defendants' motion for summary adjudication on this issue is granted.  Matlock is

2  dismissed from this case.

3

4  **G. Relief Under Cal. Civ. Code § 52.1**

5    Plaintiffs seek a judicial determination that Davis, Thatcher, the City, and BPD are liable

6  for damages under Cal. Civ. Code § 52.1. Doc. 20, Pls.' Brief, at 2:3-5.  However, in the

7  Complaint, Plaintiffs only allege that they are entitled to damages under Cal. Civ. Code § 52.1

8  against the City and BPD, not Davis or Thatcher. Doc. 1, Complaint, at 4:25-5:7.  As Plaintiffs

9  have not succeeded in establishing their Fourth Amendment rights were violated, Cal. Civ. Code

10  § 52.1 can not be applied.  Notwithstanding the merits of the matter, Plaintiffs may not recover

11  under this provision against Davis or Thatcher.

12    Plaintiffs' motion for adjudication on this issue is denied.  As Davis and Thatcher are the

13  only remaining defendants in this case (after summary adjudication on Monell and supervisory

14  liability), Plaintiffs' Cal. Civ. Code § 52.1 claims are dismissed.

15

16                                   **V. Conclusion**

17    Plaintiffs' motion for summary adjudication is GRANTED in part and DENIED in part.

18  Defendants' motion for summary judgment is similarly GRANTED in part and DENIED in part.

19  The following issues are adjudicated:

20    1. Defendants have waived the statute of limitations defense.

21    2. Issue preclusion does not apply.

22    3. The initial entry of Officers Davis and Thatcher on April 6, 1999 did not violate

23  Plaintiffs' Fourth Amendment rights.

24    4. Officers Davis and Thatcher did not undertake the First Search in order to search for a

25  potential child victim of domestic violence under the doctrine of exigent circumstance.  The

26  bedroom closet in which the evidence was found constitutes an adjoining space.  Whether the

27  First Search can be justified as a protective sweep incident to arrest is preserved for trial as the

28  questions of arrest and plain view have not been fully addressed.  Whether the First Search can

1   be justified as a parole search is also preserved for trial.

2   5. Plaintiffs' <u>Monell</u> claims are dismissed; the Bakersfield Police Department and the

3   City of Bakersfield are dismissed from this action.

4   6. Plaintiffs' claims against Matlock as a supervisor are dismissed; Matlock is dismissed

5   from this action.

6   7. As all Defendants against whom Plaintiff seeks relief under California Civil Code §

7   52.1 are have been dismissed from this action, Plaintiff's California Civil Code § 52.1 cause of

8   action is dismissed.

9

10   A status conference is set for October 17, 2005 at 2:30 P.M. for the purpose of setting a

11   trial schedule.

12

13   IT IS SO ORDERED.

14   **Dated:    September 30, 2005**            **/s/ Anthony W. Ishii**
      0m8i78                                    UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28