UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARLENE SANDERS and KEN McDANIEL,<br><br>    Plaintiffs,<br><br> v.<br><br>CITY OF BAKERSFIELD, BAKERSFIELD POLICE DEPARTMENT, ERIC MATLOCK, GLEN DAVIS, SCOTT THATCHER and DOES 1 through 10, inclusive, sued both in their individual and official capacities<br><br>    Defendants. | CIV-F 04-5541 AWI TAG<br><br>ORDER RE: DEFENDANTS' MOTION FOR RECONSIDERATION |

The matter is before the court on Defendants' motion for reconsideration of the court's September 30, 2005 Order granting in part and denying in part cross motions for summary adjudication. Doc. 53. Plaintiffs have not filed any opposition to the motion. The matter was taken under submission without oral argument.

**I. History**

Plaintiffs in this case are Arlene Sanders and Ken McDaniel, who resided at 1905 California Street, Apt. #18; Bakersfield, CA in April 1999. Defendants are the City of Bakersfield, the Bakersfield Police Department ("BPD"), Eric Matlock (Chief of BPD), Glenn Davis (BPD officer), Scott Thatcher (BPD Officer), and Does 1 through 10, inclusive (additional

BPD officers). On the evening of April 6, 1999, Davis and Thatcher responded to a report of a disturbance at Plaintiffs' apartment complex. At the scene, the apartment manager stated that there was a fight going on inside Plaintiffs' unit. As Davis and Thatcher approached the unit, they claim to have heard loud shouting. They knocked on the door and identified themselves as BPD officers. Sanders opened the door, revealing both herself and McDaniel in the living room; Davis and Thatcher entered. Davis and Thatcher claim that Sanders had an abrasion on her cheek and McDaniel put something behind the couch. Sanders demanded the officers leave and began shouting. Davis and McDaniel used force to handcuff both Plaintiffs. Davis conducted a sweep of the whole apartment. Davis found plastic bags containing what appeared to be cocaine in the right shoe of a pair of work boots in a bedroom closet; the door to the closet was open. Davis asked McDaniel if he was on parole; McDaniel affirmed he was on parole for a drug violation. He contacted the BPD to request a team to conduct a full search of the apartment. BPD officers soon arrived and seized the bags of cocaine in the course of a second search of the apartment. Defendants also claim that Davis and Thatcher were informed by another BPD officer, Orbin Love, on April 5, 1999 (the day before the arrests and searches) that McDaniel was a parolee who was suspected of dealing drugs; Plaintiffs dispute the claim.

Plaintiffs were charged with possession for sale of cocaine base in violation of California Health and Safety Code § 11351.5 on May 17, 1999. Plaintiffs plead guilty. Before their plea, they filed motions to suppress evidence pursuant to Cal. Penal Code § 1538.5, arguing the initial search violated their Fourth Amendment rights. The motion was denied, but the Fifth District Court of Appeal reversed the denial on two bases: the search extended beyond adjoining spaces and a parole search is only valid when the officer is aware of the search condition. People v. Sanders, 84 Cal. App. 4th 1211, 1220 and 1223 (Cal. Ct. App. 2000). On review, the California Supreme Court affirmed the Fifth District Court of Appeal on the parole search while expressing no opinion as to the protective sweep. People v. Sanders, 31 Cal. 4th 318, 324 n.2 (Cal. 2003). The California Supreme Court firmly held that when police are unaware an individual is subject to a search condition, a search without probable cause can not be justified after the fact by the search condition.

On April 8, 2004, Plaintiffs filed this present suit.  Broadly, Plaintiffs allege their Fourth Amendment rights were violated by entry into their apartment and search without consent or exigent circumstances.  The parties filed opposing motions for summary adjudication.  By Order of September 30, 2005, the court determined "The initial entry of Officers Davis and Thatcher on April 6, 1999 did not violate Plaintiffs' Fourth Amendment rights....Whether the [initial search] can be justified as a protective sweep incident to arrest is preserved for trial as the questions of arrest and plain view have not been fully addressed."  Doc. 53, Order, at 39:22-28.  Defendants filed a this timely motion for reconsideration, which was not opposed.

## II. Legal Standards

Under Fed. R. Civ. Proc. 59(e), any motion to alter or amend judgment shall be filed no later than ten days after entry of judgment.  A motion for reconsideration of summary judgment is appropriately brought under Rule 59(e). Backlund v. Barnhart, 778 F.2d 1386, 1388 (9th Cir. 1985).  A motion to alter or amend judgment is appropriate under limited circumstances, such as where the court is presented with newly-discovered evidence, where the court "committed clear error or the initial decision was manifestly unjust," or where there is an intervening change in controlling law. School Dist. No. 1J Multnomah County v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993).

## III. Discussion

Defendants have asked for reconsideration on a number of issues.  In relevant part, they say "Defendants are entitled to qualified immunity because the undisputed facts show that they reasonably believed exigent circumstances existed to justify the entry and search of plaintiffs' apartment." Doc. 56, Reconsideration, at 6:6-8.  In the underlying papers in the motion, Defendants asserted that they were "entitled to qualified immunity for the subsequent search of plaintiffs' apartment, because the undisputed facts support the officers reasonable belief that theirs and other persons' safety were at risk. Upon entry into the premises, the officers had not yet determined who was the victim and who was the perpetrator of the reported crime." Doc. 36,

Defendants' Brief, at 13:1-4.  Plaintiffs' opposition was brief: "Just because [the apartment manager] told the officers there *had been* an argument is not justification for the entry....Here, there was no report of any injury to any person. Moreover, before entry the officers saw and heard nothing indicating a need for swift action...Thus, the entry cannot be justified *even if one accepts Thatcher's version*." Doc. 44, Plaintiffs' Opposition, at 4:21-3, citations omitted, emphasis in the original.

The original order granted summary adjudication in favor of Defendants on the issue of entry and denied adjudication as to both parties on the issue of the apartment search.  In order to clarify, the court will revisit several of these topics from different perspectives.

**A. Initial Entry**

Davis and Thatcher were responding to a domestic disturbance tip.  The apartment manager passed on information from the Plaintiffs' neighbor that someone was being "beat up by her boyfriend." Doc. 41, Ex. F, Transcript, at 47:11-15.  Thatcher claimed to have heard "male and female voices in high argumentative tones" when approaching the apartment. Doc. 25, Amended Thatcher Declaration, at 2:15-16.  Thatcher claims "I knocked on the front door of apartment #18 and identified Officer Davis and myself as the Bakersfield Police Department.  Approximately 15 seconds later, I observed Arlene Sanders peer out the vertical blinds on the front window. The blinds were immediately shut and I heard someone inside the apartment come to the door. I then heard the lock mechanism to the front door engage as if the occupants locked the door. I again knocked and announced our presence. At this time, I again heard the lock mechanism to the front door deadbolt engage, as if the occupants had now unlocked the door." Doc. 25, Amended Thatcher Declaration, at 2:19-25.  While Plaintiffs argue that Davis and Thatcher heard no argument upon approaching the apartment, they provide no evidence to controvert Defendants' declarations.   Indeed, Sanders admitted to having an argument with McDaniel and gave a nonresponsive reply when asked how loud their argument was. Doc. 41, Ex. A, Sanders Deposition, at 21:14-23.  Significantly, the partial deposition of Sanders (as part of papers filed by the Plaintiffs) is missing key portions which discuss whether the argument was

ongoing at the time the police officers showed up. See Doc. 41, Ex. A, Sanders Deposition. The partial deposition of McDaniel filed with the court provides even less detail regarding these events. See Doc. 41, Ex. B, McDaniel Deposition. Davis and Thatcher claimed Sanders had an abrasion or cut on her cheek. Defendants have provided a picture of Sanders taken on April 6, 1999, purporting to show the abrasion, but the quality of the photo is poor. Neither the presence nor absence of an abrasion can be definitively determined from the photo. In her deposition, Sanders said only that she "did not recall having an abrasion." Doc. 41, Ex. A, Sanders Deposition, at 23:6-7. Though the statement is indirect and equivocal, it must be interpreted as a denial. As Plaintiffs have provided some evidence as to the alleged abrasion, the fact is disputed and not relied upon to justify the entry. Sanders also states that she told Davis and Thatcher at the door that she "didn't need his assistance." Doc. 41, Ex. A, Sanders Deposition, at 23:12-13. Defendants claim that Sanders demanded they leave and began shouting.

In an analogous Section 1983 case, the Ninth Circuit dealt with the issue of probable cause to enter and search a house to ensure the "welfare of the occupants." Hopkins v. Sierra Vista, 931 F.2d 524, 526 (9th Cir. 1991). The police made a forced entry after having "received an anonymous telephone call reporting that a woman in apartment 728 of the Sinaloa Apartments was 'getting the shit beat out of her' and that the violence had 'been going on for hours.'" Hopkins v. Sierra Vista, 931 F.2d 524, 525 (9th Cir. 1991). The Ninth Circuit stated:

> When Officer Gerhardt arrived at apartment 728, he heard loud voices and other noises. It is unclear, however, whether the sounds he heard were of an argument, or were simply those of a loud, albeit late, social gathering. Sounds of an argument, or yelling, would be consistent with a domestic disturbance. Gerhardt saw the door opened by a man he knew had previously been involved in domestic disturbances, who had obviously been drinking and who appeared not to want him to see into the apartment. Gerhardt's experience, with Hopkins in particular and with domestic problems in general, made these facts appear consistent with the tip. *In light of the fact that someone had suggested that domestic violence was taking place in that very apartment, Gerhardt might reasonably have determined that there was a domestic disturbance going on if he heard loud sounds consistent with a dispute.* If not, Gerhardt's determination of probable cause was based only on an untested anonymous tip, his prior knowledge of Hopkins and the fact that Hopkins had been drinking. It is questionable whether this would be enough to establish probable cause.

Hopkins v. Sierra Vista, 931 F.2d 524, 528-9 (9th Cir. 1991), emphasis added. Summary judgment was found to be inappropriate as the plaintiff disputed the nature of the sounds heard.

5

The plain language of the opinion suggests that probable cause to search exists when there is an anonymous tip of domestic violence plus sounds of argument heard from the outside.  Here, the police visit was a result of a tip from a neighbor and the police claim to have heard sounds of arguing as they approached the apartment (a claim unopposed by any evidence, only argumentation).  This case appears to fit within the language of Hopkins, justifying entry and search to ensure the safety of occupants.  "Police officers responding to a domestic violence report have a duty to ensure the present and continued safety and well-being of the occupants.....the fact that the occupants appeared to be unharmed when the officers entered did not guarantee that the disturbance had cooled to the point where their continued safety was assured." People v. Higgins, 26 Cal. App. 4th 247, 253 (Cal. Ct. App. 1994), quotations omitted.

**B. Search Pursuant To Parole Condition**

Defendants assert that qualified immunity should also apply to the search "because, at the time of the subject incident, the law in California was not settled regarding whether a parolee's status can retroactively justify an otherwise unlawful search." Doc. 56, Reconsideration, at 8:9-12.  Prior California case law had suggested that when police are unaware an individual is subject to a search condition, a search without probable cause may be justified after the fact by the search condition. See In re Tyrell J., 8 Cal. 4th 68 (Cal. 1994).  While People v. Robles, 23 Cal. 4th 789 (Cal. 2000) and People v. Sanders, 31 Cal. 4th 318 (Cal. 2003) greatly limited the Tyrell holding, these cases had not yet been handed down at the time of the events underlying this case.

While the law might not have been clear, qualified immunity does not apply in this scenario.  As stated in the original order, whether Davis and Thatcher were aware of McDaniel's parole status can not be determined as a matter of law.  That question is one of the central disputed facts in the case and must be determined by a jury.  This analysis must assume that they did not know McDaniel was subject to a search condition.  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made," and that it is "often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces." Estate of Ford v. Rameriz-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002), citations omitted.

Here, Davis and Thatcher can not be said to have mistakenly applied legal doctrine to the factual situation they faced.  Regarding the search condition, there was no reasonable, but mistaken belief, as to the facts establishing the existence of probable cause.  Not knowing anything about McDaniel's parole status, it would have been unreasonable, indeed outrageous, for them to have consciously justified their search at the time by the supposition that a search condition might apply.  The rule of Tyrell J. pointedly applies after the fact; it does not, should not, affect police actions at the time of search.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001).  Accepting Defendants' qualified immunity argument would mean accepting the repugnant position that it was objectively reasonable for police to search an individual without probable cause with the hope in mind that the individual might be subject to an unknown search condition.  As stated by the California Supreme Court, "whether a search is reasonable must be determined based upon the circumstances known to the officer when the search is conducted [; this view] is consistent with the primary purpose of the exclusionary rule--to deter police misconduct." People v. Sanders, 31 Cal. 4th 318, 332 (Cal. 2003).  While California law concerning this issue was unclear in 1999, qualified immunity simply does not apply in this sort of situation.

**C. Search As Protective Sweep**

As a general matter, "the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement." Cupp v. Murphy, 412 U.S. 291, 295 (1973), citations omitted.  Once inside the apartment, Davis and Thatcher detained the Plaintiffs and then conducted a search of areas where other individuals might be found.  For the purposes of summary judgment, there are effectively no undisputed facts that would affirmatively support a belief that additional persons were present.  Conversely, there are no facts that would suggest Davis and Thatcher knew or should have known Sanders and McDaniel were the only people in the apartment.  In the criminal proceedings against Plaintiffs, Thatcher and Davis in fact justified their search of apartment on the basis that they were making "a protective sweep of

7

the residence to make sure there is no one else in the residence that could endanger our safety." Doc. 29, Ex. B, Transcript, at 17:1-3. They did not justify the search based on suspicion that there were other potential victims, instead saying that they were conducting a protective sweep incident to an arrest. In domestic violence cases, even victims may in fact be hostile to police involvement. "[W]here as here the 'exigent circumstances' rest on a claimed imminent threat of danger to life and property, we hold the court is entitled to ask at least two questions. First, the objective test: was the threat so imminent and serious a reasonable policeman would believe that a warrantless, emergency entry was necessary to save lives and property? And, second, the subjective test: was this officer indeed motivated primarily by a desire to save lives and property?" People v. Dickson, 144 Cal. App. 3d 1046, 1063 (Cal. Ct. App. 1983). The subjective prong of the test was later modified as courts found the requirement to determine a primary motive to be unrealistic: "It is unreasonable to expect an officer to be unconcerned with the collection of evidence and the capture of criminals. While the trial court must find that the officer believed an emergency to exist, reasonable actions taken by the officer should not preclude such a finding....if the officers act in a manner inconsistent with a motive to preserve life or property, the warrantless entry or search cannot be justified after the fact by employing the exigent circumstances doctrine." People v. Duncan, 42 Cal. 3d 91, 104 (Cal. 1986).

The case law on whether the search can extend to unknown individuals given these circumstances is mixed. The facts of one Ninth Circuit case were as follows:

> In the early morning hours of May 13, 1977, two Clark County, Washington, deputy sheriffs responded to a report of a fistfight at an apartment complex. The officers arrived about one hour after the fight had ended and they interviewed the alleged victim of the assault, one Larson. The officers then followed a trail of blood leading from Larson back to Dugger's apartment, where they observed blood on the front door and keys in the lock. They rang the doorbell 'two or three times,' but heard no response from inside. Then, one of the officers, uninvited, turned the key, pushed the door open, and stepped back away from the open door. The officers then called to Dugger and identified themselves as being from the sheriff's department. They heard no immediate response. Then, a male within the apartment called out that he was putting on his shoes and would be right out....the District Court justified the warrantless entry on the grounds of exigent circumstances arising out of the bloody fistfight and the need to determine if anyone needed immediate medical attention.

United States v. Dugger, 603 F.2d 97, 97-8 (9th Cir. 1979). The Ninth Circuit found that "once the officers heard Dugger respond from within that he was coming outside as soon as he put on

his shoes, any excuse of an emergency dissipated." United States v. Dugger, 603 F.2d 97, 99-100 (9th Cir. 1979).  A California state case dealt with a situation where a rape suspect surrendered himself after being confronted by the police at his home, the site of the alleged crime.  The police had already interviewed the victim who made no mention of any other person at the suspect's home.  The court found that reentry of the premises was justified based on a third party report that a "second person had been heard inside the apartment....[in] each case the claim of exigent circumstances must be evaluated on its particular facts. Where there is reasonable cause to believe additional suspects or potential victims are in a residence, a warrantless entry is permissible." People v. Keener, 148 Cal. App. 3d 73, 76-7 (Cal. Ct. App. 1983).

In a case before the California Supreme Court:

> On November 12, 1983, Officer Klein, a Newport Beach police officer with four years' experience, received a radio call reporting a robbery at a particular address; a victim was believed to be injured and bleeding. No description was given of either the robber or his victim/victims. Klein and a fellow officer drove to the location and observed some blood spots outside the building and on the walkway outside defendant Tamborino's apartment. A neighbor, Alvino Johnson, confirmed that an injured person was inside the apartment. Klein knocked on the door to the apartment and loudly identified himself as a police officer. Receiving no response, Klein waited a minute or two and knocked again. The officers heard some sounds of movement inside the apartment. Believing that the situation required prompt action, Klein kicked in the door. He then saw defendant Tamborino in the living room walking toward the front door. He was wearing a bathrobe, was barefoot, and had quite a bit of blood on his head, neck and hands. He was holding his head and seemed to be bleeding from the right side of his face, although not profusely. Officer Klein testified that at that point he was not sure whether Tamborino was a suspect or a victim and that, for his own safety, he brought Tamborino out of the apartment and handcuffed him. After determining that the wound did not appear serious, Klein immediately reentered the apartment. His main concern was to determine whether there were any other injured persons inside; he did not stop to ask any questions of Tamborino or to "try[] to figure out what had happened at that point."
> ....
> Defendants contend that the present search was invalid because Officer Klein could point to no specific or articulable facts indicating that a second victim or suspect might be present in the apartment. But the observation of Tamborino, wounded and bleeding, coupled with the earlier report of a robbery, constituted 'articulable facts' that reasonably could have led the officer to decide that an immediate, brief search of the apartment was warranted to determine whether additional persons were present at the crime scene. Officer Klein had no prior information indicating that only one victim was involved in the robbery, and in light of the situation he confronted, ordinary, routine common sense and a reasonable concern for human life justified him in conducting a walk-through search truly limited in scope to determining the presence of other victims. Nothing in the record suggests that the officer had any hidden additional motive, such as searching for drugs or contraband, in conducting the search, and the trial court - after specifically questioning the officer on this point -- was satisfied that the officer had no such ulterior motive.

Tamborino v. Superior Court, 41 Cal. 3d 919, 922-3 (Cal. 1986).  The California Supreme Court

specifically distinguished Dugger, noting "the officers were investigating a *fistfight* involving only two men. After interviewing the first victim/participant, they followed a blood trail to the apartment of the second man. The officers confronted and questioned him, but continued to search his apartment 'for other occupants.' Under these facts, the court properly concluded that the search exceeded the scope of the exigency once the second victim had been found." Tamborino v. Superior Court, 41 Cal. 3d 919, 923 (Cal. 1986), emphasis in original. That is, the police were aware after speaking with the first individual that only two people were involve in the altercation; the police could not search further for other individuals.

      In Dugger and Keener, the police had information regarding identified (or at least enumerated) individuals. Continuing a warrantless search after contact with those individuals required some specific basis for believing additional persons might be present. With Tamborino, the information the police had was less specific: the responding police officer received a report of one injured person, a victim of a robbery. After finding an injured person, he continued looking because he suspected that (1) there might be other injured persons and/or (2) the person he came in initial contact with might be the robber and not the victim. The only additional information learned upon entry was that the injured individual did not immediately respond and was walking slowly toward the door when the officer forced entry. Given the fact that he was wounded, the delay does not seem to be unreasonable. Fundamentally, the search appears to have been justified by the police officer's lack of firm information concerning the total number of persons involved and the court found that the officer's choice of continuing the search rather than questioning the injured person was permissible. In that case, it is interesting to note that the decision does not explain what information the officer gained in speaking to the neighbor immediately prior to entering the house. There is no indication as to how the neighbor knew someone injured was inside, whether the neighbor had spoken to the injured individual, or whether the neighbor knew if the robber was still present.

      Here, Davis and Thatcher were told of a potential domestic disturbance involving a male and a female. Approaching the apartment, they heard male and female voices in argument. Upon entry, they were faced with a situation akin to that in Tamborino: they saw individuals

10

whose characteristics were consistent with the tips they had received.  There was no articulable facts suggesting that anyone else might be present.  Notwithstanding the substance of the analysis undertaken in Tamborino, the court facially agreed with the other courts that "articulable facts" are necessary.  On that basis and solely relying on undisputed facts, the court can not say as a matter of law that the search undertaken was within the scope of the exception to the warrant requirement.

      Defendants also argue they are entitled to qualified immunity for the initial search on the basis of protective sweep: "Defendant officers are also entitled to qualified immunity for the subsequent search of plaintiffs' apartment, because the undisputed facts support the officers reasonable belief that theirs and other persons' safety were at risk. Upon entry into the premises, the officers had not yet determined who was the victim and who was the perpetrator of the reported crime." Doc. 56, Reconsideration, at 7:20-23.  For qualified immunity analysis, the right that was violated "must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987), citations omitted.  The events in this case took place in 1999.  The case law in that time specified that "Where there is reasonable cause to believe additional suspects or potential victims are in a residence, a warrantless entry [or protective search] is permissible." People v. Keener, 148 Cal. App. 3d 73, 76-7 (Cal. Ct. App. 1983).  Given what the apartment manager told Davis and Thatcher, they had no reason to suspect that there were any other individuals involved besides Sanders and McDaniel, who were accounted for upon entry.  Relying solely on the undisputed material facts, the court can not grant qualified immunity at this time.  The issue of search as a protective sweep must go to the jury.

**D. Search Incident To Arrest**

      "There is ample justification, therefore, for a search of the arrestee's person and the area

11

'within his immediate control' - construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." <u>Chimel v. California</u>, 395 U.S. 752, 762-63 (1969) (citations omitted). The U.S. Supreme Court has also said officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" and further "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." <u>Maryland v. Buie</u>, 494 U.S. 325, 334, 327 (1990). These two cases demonstrate that protective sweeps are designed to prevent harm to police from two distinct sources: the arrestee using a weapon close at hand (<u>Chimel</u>) and an antagonistic third party located nearby (<u>Buie</u>).

In the previous Order, the court stated that "a protective sweep can only be undertaken incident to an arrest." Doc. 53, Order, at 28:20-21, citing <u>United States v. Reid</u>, 226 F.3d 1020, 1027 (9th Cir. 2000). Defendants argue the court has read the holding in <u>Reid</u> too broadly. Upon further reflection, the court agrees. In <u>Reid</u>, the Ninth Circuit noted that police said the criminal defendant was not under arrest and there was no probable cause for arrest at the time the sweep was undertaken. <u>United States v. Reid</u>, 226 F.3d 1020, 1023 (9th Cir. 2000). In an earlier Ninth Circuit case, the court found "Once Officer Schabert had probable cause to arrest Potter, he was entitled to search him before formally making the arrest. A search incident to an arrest is valid whether it occurs immediately before or after the arrest." <u>United States v. Potter</u>, 895 F.2d 1231, 1234 (9th Cir. 1990). The U.S. Supreme Court has said "Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 111 (1980). Though both of these cases deal with searches of the person (<u>Chimel</u>) and not searches of adjoining areas (<u>Buie</u>), the rationale holds. The key fact becomes whether there was probable cause at the time the sweep was undertaken as opposed to whether an individual was in fact arrested at the time.

Defendants assert that "Davis and Thatcher had probable cause to arrest for domestic violence." Doc. 56, Reconsideration, at 3:24-25. However, probable cause for arrest can not be

established from the undisputed facts.  When faced with material factual dispute, "the question of probable cause in a section 1983 case is usually one for the jury." Hopkins v. Sierra Vista, 931 F.2d 524, 529 (9th Cir. 1991).  Defendants' key assertion is that "Defendant officers knocked on the front door of the subject apartment and entered therein only after observing a cut on the right cheek of plaintiff Sanders's face. This fact led the defendant officers to reasonably believe that plaintiff Sanders was a probable victim to the reported criminal conduct. Therefore, the defendant officers had probable cause to believe that a crime was in progress or had been committed against either plaintiff Sanders or some other third person within the apartment." Doc. 24, Defendants' Opposition, at 16:9-14.  As stated earlier, Plaintiffs appear to dispute the assertion that Sanders's cheek was cut or bruised.  Defendants have affirmatively stated that "the plaintiffs were under arrest at the time they were handcuffed and subdued immediately after the officers' entry of the subject residence." Doc. 56, Reconsideration, at 4:1-3.  The arrests appear to have been based upon the information the Defendants gathered before entry and upon meeting Sanders at the door to the apartment.  It is up to a jury to determine if the facts justify the arrests.  Similarly, qualified immunity can not be determined at this time due to disputed facts.

### IV. Conclusion

Defendants' motion for reconsideration is DENIED.

IT IS SO ORDERED.

Dated:   **March 10, 2007**            _____/s/ Anthony W. Ishii_____
0m8i78                                 UNITED STATES DISTRICT JUDGE